[No. A093683. First Dist., Div. Two. Nov. 15, 2001.]

MARY E. INGHAM, Plaintiff and Appellant, v.
LUXOR CAB COMPANY, Defendant and Respondent.

Stephen M. Mackouse for Plaintiff and Appellant.

Leach, McGreevy & Labrador and Peter C. Labrador for Defendant and Respondent.

## OPINION

**KLINE, P. J.—**

### STATEMENT OF THE CASE

Mary E. Ingham filed a complaint against respondent Luxor Cab Company alleging wrongful ejectment and intentional and negligent infliction of emotional distress. The trial court granted respondent summary judgment and denied appellant's motion for reconsideration. We reverse.

### STATEMENT OF FACTS[1]

Appellant is a 57-year-old woman who has suffered from diabetes since 1978. As a result, she experiences kidney failure requiring dialysis, diabetic neuropathy causing numbness and pain in her limbs and body, carpal tunnel syndrome, and depression requiring therapy. The dialysis treatments she received in 1997 and 1998 caused fatigue and stabbing shoulder pain, and made her bones brittle. Because she was physically unstable and suffered dizzy spells that caused falls, appellant needed a cane to stand or walk.

---

[1]As this is an appeal of a summary judgment motion, we will treat the evidence in the light most favorable to appellant.

Appellant resided in San Francisco, on Hayes Street, between the cross streets of Clayton and Ashbury. On December 8, 1998, she had an appointment scheduled for 10:00 or 10:30 a.m. with Dr. Alcoury, a dentist whose office was located at 100 Buchanan Street in San Francisco, on the corner of Buchanan and Hermann. Appellant ordinarily would have traveled to the clinic either by taxi or bus. The Hayes Street bus stopped near her house, and she sometimes took it to Fillmore and then transferred to a bus that took her to the corner of Fillmore and Hermann. From there she would walk the remaining block and a half or so to the clinic, which was a fairly level walk. Appellant had been going to this dentist once every two weeks for two or three months.

On the day of the appointment there was a power outage in San Francisco. Appellant felt it would be useless to call a taxi company on the phone, and knew the Hayes Street bus, being electrical, would not be operating, so she went to Haight Street to wait for either a nonelectric bus or a taxi, whichever came first, to take her to the dental clinic. Had appellant used a Haight Street bus, she would have taken it to the corner of Haight and Fillmore, then another bus to the corner of Fillmore and Hermann, and then walked about a block and a half to the clinic, as she did when she used the Hayes Street bus.

Appellant successfully hailed a Luxor cab. She spoke with the driver, but testified at deposition that she could not recall that he had any distinguishing features, although he spoke unaccented English. After putting her cane on the backseat, she entered the cab in an elaborate manner, backing onto the seat, pulling her legs into the car, and using her hands to lift her left leg into the cab. After she seated herself, appellant gave the driver the address of the dental clinic. He drove a couple of blocks south on Clayton Street, turned east and "went a round about [sic] way on residential streets like over the hill," got back onto Haight, went past Buchanan and stopped at Laguna Street. Appellant did not realize they had passed Buchanan until they reached Laguna, where the driver pulled over and stopped before the intersection. The driver told her "something about the power outage was bothersome and he was in a hurry to get to his coffee shop and wait out the power outage." After also stating that there were too many cars on the street, he told appellant to get out. Appellant observed there were no traffic problems that day, even though traffic lights were not working. She told the driver she was on dialysis, showed him the cane she needed, and said she did not think she could walk to the clinic from there, as there was a steep hill and she lacked balance and did not feel very well. At some point appellant began crying and begged the driver to take her the remaining two blocks. After he refused and told her again "to get out," she paid him and left the car, which then sped off.

Appellant felt she had no choice but to continue the rest of the way on foot. No bus traveled between the drop-off point and the dentist's office, and she saw no cabs. She walked one block south on Laguna and then turned west on Hermann. The block of Hermann she needed to negotiate was entirely uphill. She walked a few feet and stopped, walked a few more feet and stopped, and repeated this process at least three more times. Then she "tilted" and fell backwards and to her left onto the sidewalk, skinning her left knee and fracturing her hip. She had not tripped on any object, nor was there anything unusual about that stretch of sidewalk other than the incline.

## DISCUSSION

### *The Standard of Review*

Summary judgment is to be granted only when there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) All doubts as to whether there are any triable issues of fact are to be resolved in favor of the party opposing summary judgment. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].) The standard of review for summary judgment rulings is de novo. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].) Our Supreme Court has declared that "[d]uty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 465 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

### *Respondent Breached the Duty to Deliver*
### *Appellant to the Address She Designated*

Actionable negligence involves (a) a legal duty to use care, and (b) a breach of that duty which (c) is the proximate or legal cause of the resulting injury. (E.g., *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) At the commencement of the hearing on respondent's motion for summary judgment, the trial court stated its "tentative ruling" that "there is just no breach of the duty. I suppose more aptly, I might have said there is no duty." The court noted that appellant was not injured inside the cab, but "after she's out of the car." When appellant's counsel argued that appellant's injury was caused by her wrongful ejectment at a place other than her destination, the court rhetorically asked: "Where is it written in the law that the cab driver has an obligation to deliver a person to the ultimate destination that the person asked to be delivered to?"

In the order granting summary judgment, the court adopted its tentative ruling. The court's conclusion that "[t]here is no triable issue of fact re

breach of duty," is seemingly predicated on the undisputed fact that, as stated in the order, "[appellant] walked one and one half blocks from where she exited the cab and then fell down." Stated differently, the court appears to have accepted respondent's argument that any duty respondent may have owed appellant was discharged at the time appellant left the cab at a safe place, and respondent could not be held liable for the injury she thereafter suffered.

In the trial court's view, a passenger of a taxicab has no contractual right to be taken to a designated place. The alleged breach of such a contract, the court reasoned, could not support causes of action that sound in tort. At the hearing on appellant's motion for reconsideration, the court observed that appellant had not alleged breach of contract. "If you had a contract action that might be an interesting thing. Of course, your contract damages, I'd probably be saying to you, 'Sorry, go downstairs, or go to small claims court.' Because it's clearly not within the jurisdiction of the unlimited jurisdiction courts. Failure to transport somebody the last two blocks. You know, their fee for that might have been sixty cents, or whatever it is per quarter mile today. . . . [¶] So that as a contract case [you have] a very limited issue. So then your next point is look, she slipped and she fell on the sidewalk after she's discharged. Okay? You know, I guess what I am saying to you is I don't think that they have breached a duty here."

The trial court's analysis and conclusion were clearly erroneous.

■ A taxicab is a common carrier. (*Butigan v. Yellow Cab Co.* (1958) 49 Cal.2d 652, 657 [320 P.2d 500, 65 A.L.R.2d 1]; *McNeil v. Yellow Cab Co.* (1978) 85 Cal.App.3d 116, 118 [147 Cal.Rptr. 733]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 768, pp. 107-108.) Except where a passenger is carried gratuitously (see Civ. Code, § 2096), such carriers are held to a high standard of care for their passengers. Civil Code section 2100 specifies that "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill."

There are two general types of "legal duty." The first is the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated. The second is an affirmative duty where the person occupies a particular relationship to others. In the first situation, a person is not liable unless he or she is actively careless. In the second, a person may be liable for failure to act affirmatively to prevent harm. (See 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 732, p. 61.) As construed by the courts, Civil Code section 2100 elevates the duty of a common carrier to its passengers to the

higher, affirmative duty. (See, e.g., *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785 [221 Cal.Rptr. 840, 710 P.2d 907].)

California's courts have, for example, long held that when a common carrier contracts to convey a person, such contract gives rise to a duty to deliver the passenger to his or her destination. (*Sloane v. Southern Cal. Ry. Co.* (1896) 111 Cal. 668, 676-677 [44 P. 320]; *Gorman v. Southern Pacific Co.* (1892) 97 Cal. 1, 6 [31 P. 1112]; *Miller v. Pacific Electric Ry. Co.* (1915) 169 Cal. 107, 110 [145 P. 1023]; *Delmonte v. Southern Pacific Co.* (1905) 2 Cal.App. 211, 215; *Vietti v. Hines* (1920) 48 Cal.App. 266, 269.) The duty of due care does not necessarily end when the passenger alights safely from the carrier's vehicle; it ends only " 'when the passenger is discharged into a relatively safe space . . . .' " (*Riggins v. Pacific Greyhound Lines* (1962) 203 Cal.App.2d 125, 128 [21 Cal.Rptr. 336], quoting *Parker v. City & County of San Francisco* (1958) 158 Cal.App.2d 597, 603 [323 P.2d 108].) ▮ As will be seen, a common carrier that ejects a passenger at a place other than the designated destination and in doing so subjects the passenger to reasonably foreseeable injury, violates a common carrier's affirmative duty to prevent harm to its passengers.

Moreover, it has long been settled that breach of the contractual duty to deliver the passenger to an agreed-upon destination can justify tort damages. *Sloane v. Southern Cal. Ry. Co., supra,* 111 Cal. 668, which appellant herein specifically relied upon, is the seminal case. There the plaintiff purchased a train ticket to travel from North Pomona to San Diego. Before reaching San Bernardino, the conductor took her ticket and gave her no receipt. When the train reached San Bernardino, the plaintiff was required to change to another train of cars also belonging to the defendant. The conductor in charge of the new train demanded her ticket, and when she told him she had given it to the conductor in the first train, he informed her she must either pay her fare or leave. Because she had no money with her, she left the train at the next stop, East Riverside. She then walked part of the way back to the town of Colton and received a lift from a passing vehicle for the rest of the distance. She spent the night in Colton and the next day, after borrowing some money, purchased another ticket and traveled to San Diego. (*Id.* at pp. 675-676.) The plaintiff thereafter sought a tort recovery, claiming she had been subjected to "humiliation and indignity for which she was entitled to redress." (*Id.* at p. 678.) The jury returned a verdict for the plaintiff in the amount of $1,400. On appeal, the defendant claimed that "as the plaintiff left the car at East Riverside, in accordance with the previous directions of the conductor, and no personal violence was used or displayed towards her, her only right of action is for breach of the defendant's contract to carry her to San Diego, and that the extent of her recovery therefor is the price paid for the second

ticket, and a reasonable compensation for the loss of time sustained by her." (*Id.* at p. 676.) The Supreme Court disagreed. Affirming the verdict,[2] the high court stated that "[t]he plaintiff's right of action against the defendant is not, however, limited to the breach of its contract to carry her to San Diego, but includes full redress for the wrongs sustained by her by reason of the defendant's violation of the obligations which it assumed in entering into such contract. If she was wrongfully prevented by the defendant from completing the passage to San Diego, for which it had contracted with her, she could either bring an action simply for the breach of this contract, or she could sue it in tort for its violation of the duty as a common carrier, which it assumed upon entering into such contract. [Citations.] The complaint in the present case is not merely for the breach of the contract, nor is it merely for the wrong committed in excluding her from the car, but it is to recover the damages sustained by her by reason of the wrongful acts committed by the defendant in violation of its contract." (*Id.* at pp. 676-677; accord, *Gorman v. Southern Pacific Co., supra,* 97 Cal. at p. 6.) Though more than a century old, *Sloane* is still good law and is still relied upon as a paradigmatic example of a contractual relationship creating a duty which, if breached and causes injury, gives rise to a tort action. (See, e.g., *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774, fn. 6 [69 Cal.Rptr.2d 466]; *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 175 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].)

Ejectment of a passenger by a common carrier may be wrongful and actionable even if it occurs at an apparently safe place. There was no allegation of hazardous conditions at the ejectment points of the plaintiffs in *Sloane v. Southern Cal. Ry. Co., supra,* 111 Cal. at pages 675-676, and *Gorman v. Southern Pacific Co., supra,* 97 Cal. at page 3, or for that matter in *Marlow v. Southern Pacific Co.* (1907) 151 Cal. 383, 385 [90 P. 928], *Procter v. Southern Cal. Ry. Co.* (1900) 130 Cal. 20, 22-23, or *Brigham v. Southern Pac. Co.* (1905) 2 Cal.App. 522, 524, but due to other circumstances creating a foreseeable danger, recovery of damages was nevertheless allowed. Damages may be had for harm suffered in leaving the discharge point, whether it be physical injury (*Bland v. S. P. R. R. Co.* (1884) 65 Cal. 626, 628-629 [4 P. 672]), illness due to weather conditions during the walk (*Clare v. Northwestern Pac. R.R. Co.* (1913) 21 Cal.App. 214, 219-221 [131 P. 323]; *Delmonte v. Southern Pacific Co., supra,* 2 Cal.App. at pp. 212, 215), or inconvenience caused by the ejectment. (*Marlow v. Southern Pacific Co., supra,* 151 Cal. at p. 385 [plaintiff mother with frightened nursing child ejected without her trunk or any money]; *Procter v. Southern Cal. Ry. Co.,*

---

[2]The court found the $1,400 in damages the jury awarded to be excessive, and ordered a new trial unless the plaintiff stipulated to remittitur of the award to $400. (*Sloane v. Southern Cal. Ry. Co., supra,* 111 Cal. at pp. 687-688.)

*supra,* 130 Cal. at p. 25 [plaintiff ejected without her trunk thousands of miles from home]; *Sloane v. Southern Cal. Ry. Co., supra,* 111 Cal. at pp. 684, 687 [plaintiff could recover for the walk of about a mile the ejectment forced her to undertake which caused her no "direct physical injury"].)

Respondent's reliance on *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011 [67 Cal.Rptr.2d 516] and *Brandelius v. City & County of S.F.* (1957) 47 Cal.2d 729 [306 P.2d 432] is misplaced. In *McGettigan,* the plaintiff, who was drunk and sleeping on the train, was ordered off the car at the end of the line and onto the platform, "a 'reasonably' or 'relatively' safe place." Because ejectment at that place did not create "a situation of peril that increased the risk of harm," the carrier-passenger relationship terminated, as did the affirmative duty of the defendant carrier. (*McGettigan, supra,* 57 Cal.App.4th at pp. 1020-1021.) In *Brandelius,* the plaintiff's decedent had left the cable car at his desired stop when he was hit by a cable car traveling in the opposite direction. Whether the carrier-passenger relationship had terminated prior to the injury was held to be a question of fact properly left to the jury. (*Brandelius, supra,* 47 Cal.2d at p. 736.)

For the most part, the cases the parties rely upon involve trains, not taxicabs. Trains carry their passengers to fixed stations, and passengers understand they will not be taken to their ultimate destination, only to a station nearby. By contrast, taxis offer transport to the exact destinations individual passengers request, which is, of course, the reason they charge considerably more than trains and most other common carriers to traverse the same distances. Thus, while trains and taxis are both common carriers and therefore subject to the same general duty of care under Civil Code section 2100, that duty may impose a different and sometimes higher responsibility on a taxi than a train. In *Lopez v. Southern Cal. Rapid Transit Dist., supra,* 40 Cal.3d 780, the Supreme Court defined the statutory duty as "requir[ing a common carrier] to do all that human care, vigilance, and foresight reasonably can do under the circumstances. [Citation.]" (*Id.* at p. 785.) Thus, for example, a carrier will be relieved of the duty to deliver a passenger directly to his or her intended stop where that is impossible because another bus blocked the bus stop. (*MacLean v. City & County of S.F.* (1954) 127 Cal.App.2d 263, 272 [273 P.2d 698].)

Accepting the facts as alleged in the complaint, as we must, no such impossibility appears here. The driver made no good faith effort to take appellant close to the clinic. Inexplicably, according to appellant, he drove by a point only one block from the clinic without stopping before dropping appellant off two blocks away. Moreover, and very significantly, the injury

appellant suffered as a result of having to walk back to the clinic appears to have been reasonably foreseeable, and foreseeability is a critical element with respect to the duty of a common carrier. (See, e.g., *City and County of San Francisco v. Superior Court* (1994) 31 Cal.App.4th 45, 48 [36 Cal.Rptr.2d 372].) Appellant was not only visibly disabled and distraught at the prospect of having to walk two blocks and uphill, but asserts that she explained to the driver in detail the physical afflictions that provided the reasonable basis of her fear of injury.

The central question this case presents is not the duty of respondent to deliver her to the address she gave the driver, which seems to us established as a matter of law, but the reasonableness of appellant's conduct after she was ejected from respondent's cab at another place. This is a question of causation.

*The Issue of Proximate Cause Presents a Factual Question for the Jury*

■ In addition to its contention that it had no duty to deliver appellant to the specific address she gave the driver, which we have rejected, respondent suggests (though it never explicitly argues) that the injury appellant suffered was caused not by her ejection from respondent's taxicab but by her own subsequent conduct, which (it implies) was unreasonable and unforeseeable.

As has been noted, " 'The very highest degree of care and caution is not required of the expelled traveler. It is sufficient if he [or she] use such prudent care as is reasonable under the circumstances.' [Citation.]" (*Clare v. Northwestern Pac. R.R. Co.*, *supra*, 21 Cal.App. at p. 221.) What is "reasonable under the circumstances" usually presents a factual question. Thus, in *Sloane v. Southern Cal. Ry. Co.*, *supra*, 111 Cal. 668, the Supreme Court found that the trial court "properly left to the jury to determine whether Mrs. Sloane exercised reasonable prudence in undertaking the walk from East Riverside to Colton, and, if so, that the injury sustained by her was a proper element of damages to be recovered. It could not say as [a] matter of law, or instruct the jury, that under the evidence before them such walk was or was not necessary, or whether the route selected by her was the most feasible; nor would it have been justified in directing them not to allow compensation for any injury sustained by the walk, upon the ground that if she had waited a few hours she could have gone upon the cars." (*Id.* at p. 684.)

Similarly, summary judgment could not properly be granted respondent on the ground that, as a matter of law, appellant acted "unreasonably under the circumstances," and respondent could not reasonably be expected to

anticipate and prevent the injury she brought upon herself. Because of the drastic nature of the summary judgment procedure and the importance of safeguarding appellant's right to a trial, respondent would have to make a very strong showing that appellant acted unreasonably. (*Eagle Oil & Ref. Co. v. Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264]; *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709 [50 Cal.Rptr.2d 323] [defendant moving for summary judgment must " 'conclusively' " negate necessary element of plaintiff's case or demonstrate that " 'under no hypothesis' " is there a material issue of fact].)

Respondent contended at the hearing on the motion for summary judgment that appellant acted unreasonably in that she "had a choice whether to stay in the cab or not. Or she could have gotten another vehicle or mode of transportation." The trial court agreed appellant had a choice when asked to leave the cab.

Whether appellant had a choice to remain in the cab, or whether, after leaving, she could have obtained alternate transportation, presents questions of fact. While a court may decide factual questions if no rational juror could find to the contrary, that is certainly not the case here. According to appellant, the cab driver twice specifically instructed her to "get out" of the cab. This appears to have been an order, not a request. While it is true the driver did not physically remove appellant from the vehicle, actionable ejectment does not require force (*Sloane v. Southern Cal. Ry. Co., supra,* 111 Cal. at pp. 676-677; *Gorman v. Southern Pacific Co., supra,* 97 Cal at p. 6; *Marlow v. Southern Pacific Co., supra,* 151 Cal. at p. 385; *Procter v. Southern Cal. Ry. Co., supra,* 130 Cal. at pp. 22-23; *Brigham v. Southern Pac. Co., supra,* 2 Cal.App. at p. 524), as it would be very bad policy to require a passenger to have to wait for the application of physical force in order to preserve a cause of action (cf. *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 261 [42 Cal.Rptr.2d 440]). Further, even if appellant could have ignored the driver's instruction to leave the cab, he refused to drive her to the dentist with whom her appointment was imminent. The record also does not show that alternative transportation was available. Appellant stated at deposition she saw no other buses or cabs in the area and, given the time pressure of the upcoming appointment, she could not wait. There is also nothing in the record suggesting that once she had begun to walk, appellant did so in a manner that increased her risk of injury.

The circumstances of this case are thus very different from those of *Lammers v. Pacific Electric Ry. Co.* (1921) 186 Cal. 379 [199 P. 523]

(*Lammers*)[3] and *Benson v. Central Pacific R. R. Co.* (1893) 98 Cal. 45 (*Benson*), upon which respondent heavily relies.

*Lammers* was an appeal from a judgment awarding the plaintiff $2,500 for injuries sustained after being expelled from the defendant's train. Because he could not produce a ticket, and appeared inebriated or in a "disturbed mental condition," a conductor ordered the plaintiff off the train. The conductor saw the plaintiff leave the tracks and enter a ditch, where the conductor thought he would remain until he " 'sobered up.' " (*Lammers, supra,* 186 Cal. at pp. 380-383.) The Supreme Court reversed because it found that the plaintiff had alternatives and acted unreasonably. Instead of remaining in the ditch, where "he would have been uninjured," the plaintiff walked three quarters of a mile along the tracks to a place where, six hours later, he was injured by one of defendant's trains. (*Id.* at pp. 383-384.)

The plaintiff in *Benson* was a child in the custody and control of her father. The train on which they were traveling stopped so briefly at Watt's Station, where they intended to disembark, that they were unable to do so, and had to go on to Emery Station, which was the next stop. Though the father knew a train traveling back to Watt's Station was expected, he did not wait but walked back along the tracks with his child. A fireman on this train saw the father and child leave the track as the train approached at only 15 miles per hour, but did not see the frightened child run back in front of the train until it was too late to stop. (*Benson, supra,* 98 Cal. at pp. 46-48.) The *Benson* court found that the failure of the defendant to allow the plaintiff time to alight at Watt's Station was a wrongful act, but concluded that this wrong did not justify the plaintiff's conduct. The plaintiff could have either waited for a train back to the Watt's Station or walked to that station along surrounding roads, rather than along the railroad tracks where she was hit. (*Id.* at pp. 49-50.) Therefore, the defendant railroad's "failure to leave plaintiff at Watt's Station and carrying her to Emery Station was not the proximate cause of her injury." (*Id.* at p. 51.)[4]

---

[3]*Lammers, supra,* 186 Cal. 379, was disapproved on another point in *Vesely v. Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151], which was in turn abrogated by statute. (See Bus. & Prof. Code, § 25602, subd. (c); *Cory v. Shierloh* (1981) 29 Cal.3d 430, 434-436 [174 Cal.Rptr. 500, 629 P.2d 8].)

[4]*Benson, supra,* 98 Cal. 45, and *Lammers, supra,* 186 Cal. 379, were decided prior to *Palsgraf v. Long Island R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253]. Under the theory expounded in *Palsgraf,* which has been adopted in California, conduct is negligent when it creates an unreasonable risk of harm to some general class of persons. If the plaintiff is not within that class, the injury does not give rise to liability. Under this duty approach, liability for unforeseen consequences is avoided by limiting the scope of the *duty,* rather than by restricting the rules of proximate cause. (6 Witkin, Summary of Cal. Law, *supra,* Torts, § 733, p. 61; see also *Wawanesa Mutual Ins. Co. v. Matlock* (1997) 60 Cal.App.4th 583, 585 [70 Cal.Rptr.2d 512].) This approach was not followed in *Benson* and *Lammers,* which do not distinguish between, and confuse the issues of, duty and causation.

The acts of the defendants in *Lammers* and *Benson*, though wrongful, were found not to have been the causes of the plaintiffs' injuries because of the unreasonable conduct of the plaintiffs after they were expelled. But the rulings in those cases were made by the Supreme Court after trials that produced substantial evidence of the unreasonableness of the plaintiffs' conduct in the unique circumstances presented, not on the basis of the speculation that would be required in order to sustain the summary judgment ruling in the present case. Moreover, considered in the indulgent light appropriate to a motion for summary judgment, the record suggests that appellant's conduct is more comparable to that of the plaintiff in *Clare v. Northwestern Pac. R.R. Co., supra*, 21 Cal.App. 214, where the liability of the carrier for wrongful ejection was sustained on appeal, than to the conduct of the plaintiffs in *Lammers* and *Benson*. The plaintiff in *Clare* was wrongfully ejected from a train for refusal to pay an unjustified additional fee for not purchasing a ticket before entering the train. He walked 2,000 feet to his home (rather than 300 feet to the nearest station) in the hot sun even though he had recently had surgery and "was in a somewhat enfeebled condition." (*Id.* at pp. 219-220.) A jury found this conduct was reasonable in the circumstances, and the Court of Appeal affirmed, concluding that the jury was also "justified in concluding that he was rendered ill and confined to his bed for several weeks and incapacitated from performing his ordinary work for a period of seven months." (*Id.* at p. 219; see also *Sloane v. Southern Cal. Ry. Co., supra*, 111 Cal. at p. 684 [ejected plaintiff not required to wait a few hours at the station to board another train]; *Bland v. S. P. R. R. Co., supra*, 65 Cal. at pp. 628-629 [ejected plaintiff not obliged to go to the nearest "dwelling-house" to wait for a carriage].)

While we know of no California wrongful ejectment case involving a taxicab that is factually similar to this case,[5] there is at least one similar case

---

[5]*Grier v. Ferrant* (1944) 62 Cal.App.2d 306 [144 P.2d 631] is, however, similar in some respects. There the Court of Appeal reversed the dismissal of negligence claims against a taxicab company where the plaintiff's injury occurred before he entered a cab. The plaintiff allegedly had neuromuscular dystrophy, which made him unsteady and prevented him from walking more than a few feet at a time. (*Id.* at p. 309.) While he did not inform the defendant of this condition, it was obvious and known to the defendant and his agents. (*Ibid.*) The plaintiff went to the defendant's office and requested a cab. The defendant directed a driver to bring the plaintiff to his cab, located 150 feet down the street. Although a parking space in front of the office used for passenger pick-ups was vacant, the driver did not bring the car to the office but, despite his knowledge of the plaintiff's disability, made him walk to the cab. On his way to the car the plaintiff slipped and fell. The court ruled that although the plaintiff had not yet entered the cab, the carrier-passenger relationship began as soon as the defendant's company had accepted the plaintiff as a passenger and the passenger had placed himself under the company's control, which included the unnecessary and dangerous walk to the cab. (*Id.* at pp. 309-311.) In the present case, the injury occurred after rather than before the ride, but it would be nonsensical to hold a taxicab owner liable for an injury caused by negligence that occurred before a ride, but not one occurring after a wrongful ejection, where in both cases the disability of the plaintiff was known to the cab company defendant.

from another jurisdiction. In *Trevino v. Flash Cab Co.* (1991) 272 Ill.App.3d 1022 [209 Ill.Dec. 545, 651 N.E.2d 723], the plaintiff, an apparently able-bodied woman, boarded a cab and asked to be driven to her home four blocks away. The driver made multiple wrong turns, refused to follow the plaintiff's directions, and ordered her out of the cab five blocks from her home. She walked to a street corner, waited eight minutes for another taxi and, when none appeared, started walking home on a sidewalk covered with ice and snow. After traveling about 560 feet, she slipped and fell on ice and was injured. (*Id.* at pp. 725-726.) Reversing the trial court's grant of summary judgment for the defendant cab company, the appellate court stated, "[T]he plaintiff was neither taken to her desired destination nor an intermediate transfer point. Rather, she was wrongfully ejected at a location of the defendants' choosing, subjecting her to the very perils she sought to avoid by engaging their services. [¶] . . . We can perceive of no compelling reason why this duty should not encompass an obligation on the part of the carrier to protect its passenger from a foreseeable risk of harm in the event of a wrongful ejection. The magnitude of guarding against such a risk is minimal and the only consequence of placing such a burden upon a carrier is to cause it to refrain from wrongfully ejecting its passengers." (*Id.* at p. 728.) We agree.

## DISPOSITION

For the foregoing reasons, the judgment is reversed and the matter remanded to the superior court for further proceedings consistent with this opinion. Appellant is awarded her costs on appeal.

Haerle, J., and Lambden, J., concurred.

A petition for a rehearing was denied December 17, 2001, and respondent's petition for review by the Supreme Court was denied January 23, 2002.